In the Matter of the ESTATE of Emma Rose LEONARD, Deceased.

Joseph FOLTA et al., Appellants,

v.

Rosalie RIEFLE, Marie Dobbs, Gladys Brinker and Frances Renstron, Respondents.

No. 55172.

Supreme Court of Missouri, Division No. 2.

March 8, 1971.

On Denial of Motion for Rehearing or to Transfer to Court En Banc.

May 10, 1971.

Factually, it appears that Mrs. Emma Rose Leonard executed her last will and testament on December 11, 1959. At that time she owned 1,500 shares of the common stock of American Telephone and Telegraph Company, which had a par value of $33⅓ per share. On May 28, 1964, the company recapitalized, reducing the par value of its common stock to $16⅔ per share, and distributed new shares on a two-for-one basis. Immediately prior to the new issue, she had owned 1,450 shares which were replaced by 2,900 shares. Fifty (50) original shares bequeathed to her husband were sold after his death on May 7, 1960.

After bequests of a specified sum of money to each of several brothers and sisters, testatrix, in paragraph 4, provided:

"To my nephews and nieces, or the descendants of each, or to the heirs at law at the date of my death of each, if in any case there are no descendants I give and bequeath the total of One Thousand Four Hundred Fifty (1,450) Shares of the Common Stock of the American Telephone and Telegraph Company, in the number of shares of such Common Stock set down immediately after and following the name of each, as follows: (Thereafter, twenty-three such persons were named with a specific number of shares set opposite the name of each.)

John C. Sweeney, Edward C. Westhouse, St. Louis, for appellants.

Claude W. McElwee, Jr., Claude W. McElwee, McElwee & McElwee, St. Louis, for respondents.

MORGAN, Judge.

In this will construction case, only one question need be answered. It is: should the additional shares of corporate stock issued as a result of a two-for-one stock split be distributed to the named legatees of the original shares, or should such shares be added to the residuary clause and distributed to the recipients thereof? The probate court ordered that such new shares be delivered to the named legatees, but the trial court found otherwise and ordered the additional shares distributed to the residuary legatees. We reverse.

Paragraph 5 bequeathed fifty shares to her husband which were sold after his death. Paragraphs 6, 7, 8, 9 and 10 set out specific bequests of rings, oil paintings and release of certain debts owed testatrix. Paragraph 11 would have given all household items to the husband. Paragraph 12 created a trust to manage "all the rest, residue and remainder" of the property to provide an income for the husband, and upon his death to terminate, and the assets thereof to be distributed to five nieces (residuary legatees), who were also named as legatees of a certain number of shares of stock in paragraph 4. The latter provision

was set out in subparagraph 12(d), and provided:

"Upon the death of my said beloved husband, Thomas L. Leonard, my trust estate hereby created shall cease and determine and the entire net corpus thereof, *including all increments of every kind and character,* shall be paid over * * * to * * * [five named nieces]" (Emphasis added.)

Paragraph 13 provided:

"Should my beloved husband predecease me, or should he and I die as the result of a common accident, then, and in such event, all trust provisions herein shall become null and void and *all property of which I may die possessed* shall be distributed under the terms and conditions herein set forth relative to the termination of my trust estate upon the death of my said beloved husband, Thomas L. Leonard." (Emphasis added.)

Paragraph 14 called for the lapse of any bequest to those that might contest the will. Paragraph 15 provided, in part: "I direct my Executors to pay all * * * taxes * * * against any gift, devise or bequest, out of the general assets of my estate * * * taxes * * * shall not be charged against or deducted from any such gift * * *."

The cause was tried on a stipulation of facts plus limited testimony of one residuary legatee; and as noted, the trial court entered judgment in favor the residuary legatees for the added 1,450 shares resulting from the stock split. From the findings and conclusions of record, the court's reasoning appears to have been "that testatrix had full knowledge of the second split and had full knowledge that 2,900 shares were in the agency account"; that she had such knowledge for "seventeen months and thirteen days before [her] death"; that "the additional 1,450 shares * * * became a part of her estate as a result of the stock split * * * [and] constituted an increment to her estate as that term was used, intended and understood by testatrix in paragraph 12(d) of her last Will." In addition: "That the testamentary scheme and intent of the testatrix, as determined from the four corners of her last Will, plainly and manifestly was that the residuary legatees, whose names appear in paragraph 12(d) of said last Will, were the prime objects of her love and bounty and it was her intention that they would receive any 'increments' in the number of shares * * *."

Appellants submit that such findings are totally unsupported by the evidence, and that the conclusion reached is contrary to the established law of this state as declared in Shriners Hospitals for Crippled Children v. Emrie, Mo., 347 S.W.2d 198, and the many cases cited and discussed therein. Admittedly, in view of the similarity of facts in this and the Shriners case, there is some temptation to arbitrarily agree with appellants. However, no two wills are written exactly the same, and each case must turn on its own particular facts. For that reason we must determine the "actual intent" of this particular testatrix.

Respondents seek to sustain their position, as well as that of the trial court, by submitting: (1) that the additional shares "would constitute increments" to the estate; (2) that the words "including all increments of every kind and character," used in paragraph 12(d), providing for distribution to the residuary legatees, must be read in connection with that part of paragraph 13 which says "all property of which I may die possessed" shall be distributed as provided on termination of the trust—that is, to the residuary legatees; (3) that testatrix had previously written a will dated October 10, 1952, making similar bequests of corporate stocks, and after a three-for-one stock split she had written the will with which we are now concerned—with the claimed inference that failure to write a new will after the "second" split is indicative testatrix wanted the number of shares listed to remain as they were; and, that from all surrounding circumstances it

was the intent of testatrix that the additional 1,450 shares would go to the residuary legatees.

The many factors to be considered in seeking to find the "intent" of the testatrix have been expressed many times and all need not be reviewed. Boxley v. Easter, Mo., 319 S.W.2d 628; Ussher v. Mercantile Trust Co., Mo., 328 S.W.2d 699; Walters v. Sisler, Mo., 371 S.W.2d 187. First, we mention those arguments of respondents that we do not find persuasive nor helpful in our task. If we ignore for the moment the dispute as to the admissability of the earlier 1952 will, and compare it with that of 1959, it is clear the three-for-one stock split had been taken into account in writing the later will. However, in view of the many other changes made as to the manner of distribution of other properties and assets, it is pure speculation to say the first stock split motivated the new will. For instance, the original will had no specific bequests of jewelry or oil paintings nor where the recipients of the trust estate on the death of the husband the same. The present residuary legatees were not named therein, but said trust estate was to go to two sisters upon the death of the husband. With such changes, we can not make the deductions asked for by respondents nor made by the trial court. As suggested by respondents, we consider those portions of paragraphs 12(d) and 13 heretofore italicized. Clearly, the words "including all increments of every kind and character" refer to the "increments" to the trust estate, during the expected lifetime of the husband, and did not refer to other bequests unrelated to the trust. As to paragraph 13, it is true that it is somewhat ambiguous. It was contingent on the husband predeceasing testatrix or dying in a common disaster with her, and did provide that in the event of either contingency "all property of which I may die possessed" shall be distributed as provided in paragraph 12(d) (to the residuary legatees). If such words were taken literally, it would mean, since the husband had died, that all of the property of testatrix would fall into the residuary estate. Since provisions of a will must be construed in harmony with each other, if possible, it is our opinion testatrix intended to mean only that property designated for the trust estate; and, that such contingencies as mentioned in paragraph 13 were not designed to call for revocation of all other provisions of the will. Other facts upon which respondents rely can be evaluated while considering applicability of precedents wherein the same questions were involved. A few are: In Re Largue's Estate, 267 Mo. 104, 183 S.W. 608; Fidelity Nat. Bank & Trust Co. v. Hovey, 319 Mo. 192, 5 S. W.2d 437; In Re Calnane's Estate, Mo. App., 28 S.W.2d 420; Adams v. Conqueror Trust Co., 358 Mo. 763, 217 S.W.2d 476, and the Shriners case, supra. As stated in the latter case (347 S.W.2d l. c. 201): "A stock split, such as we have here, is a mere change in form of the stockholder's interest in the company and not a change in the substance of the property. * * * The fact that the additional shares of stock acquired by the testatrix by reason of such a stock split 'pass under a specific bequest of the original shares, is too well settled for contradiction.' (Citing numerous authorities.) * * * (l. c. 203) When it is necessary to determine what property the testator intended to bequeath specifically, the description employed by the testator is applied to the property as of the date of the will." In answer to the quoted authority, however, respondents contend that the conclusions reached in the Shriners case only apply if the bequest is "specific," and that classifying a bequest as specific or general is a secondary rule of construction and should not be resorted to when the intention of the testator is clear. Assuming this statement to be true, the arguments of respondents do not establish the intent of testatrix otherwise, and we must resolve whether or not this bequest of 1,450 shares was' or was not specific. If it is found to be specific, appellants must prevail by reason of the precedents listed which, also, fully delineate the distinctions between a specific or general bequest. In addition,

finding the intent of the testatrix necessarily calls for a determination of whether or not she intended to make a specific bequest. Fidelity Nat. Bank & Trust Co. v. Hovey, supra, 1. c. 441; In Re Calnane's Estate, supra, 28 S.W.2d 1. c. 421. It is our opinion that she did, because (1) the bequest of the stock was closely associated with other gifts, rings and pictures, that were clearly specific, (2) the gift was not to be disturbed or diminished by any assessment of taxes, which were to be paid from the residue of the estate, and (3) the 1,450 shares were kept in an agency account which testatrix insisted be maintained in the exact amount. Nor can we attach any significance to the fact testatrix did not bother to write a new will after the stock split. This fact, as well as others just mentioned, were all considered in the Shriners case and the deductions therefrom were all found contrary to respondents' position.

Of course, every bequest of corporate stock may not be specific. If found to be a general bequest, the result would be otherwise. The answer would turn on the facts of the particular case.

■ We have concluded that testatrix intended to make a specific bequest of the 1,450 shares to the legatees as named in paragraph 4, and we find that the additional 1,450 shares resulting from the stock split should be added to that bequeathed to each legatee in the proportion designated.

The judgment is reversed and the cause is remanded for further proceedings consistent with this opinion.

All of the Judges concur.

## ON MOTION FOR REHEARING OR TO TRANSFER TO THE COURT EN BANC.

PER CURIAM:

■ Respondents, residuary legatees under paragraph 12(d) of the will and also specific legatees under paragraph 4 thereof, have filed a motion for rehearing. They make no challenge as to the propriety of the opinion rendered in so far as it restates the law of this state pertaining to the effect of a stock split on a specific bequest of corporate stock. In fact, they tacitly concede that resolution of the legal question originally submitted was proper. However, they now ask that we modify the opinion so that six non-appealing specific legatees of the twenty-three so designated in paragraph 4 will be barred from taking according to the law as announced in the opinion; or, in other words, that the executor be directed, in fact, to follow the law in distribution to the seventeen but follow the erroneous opinion of the trial court as to the six. We are not inclined to require such an unjust result under the factual situation presented.

To sustain their argument for such an incongruous result, movants rely on the following authorities: People's Bank of Glasgow v. Yager, 329 Mo. 767, 46 S.W.2d 585; In re Scheiner's Will, 215 Iowa 1101, 247 N.W. 532; In re Horner's Will, 237 N.Y. 489, 143 N.E. 655; Succession of Manthey, 159 La. 743, 106 So. 289; and, 5B C.J.S. Appeal and Error § 1920, p. 414. The text authority, last cited, states as a general rule that, "Where less than all of several coparties appeal from an adverse judgment, it is generally held that a reversal as to the parties appealing does not necessitate or justify a reversal as to the parties not appealing, but that the judgment may or must be affirmed or left undisturbed as to them, according to the practice prevailing in the particular jurisdiction. * * * The rule that reversal on appeal by a party does not justify reversal in favor of nonappealing parties, however, is not invariable, and *where the judgment is not severable*, or where the rights and interests of the parties are so intermingled and interdependent that reversal in favor of one would injuriously affect the rights of his coparties, the court, if reversal is proper as to appellant, may reverse as to nonappealing parties." (Emphasis added.)

The same text in § 1835 also concludes that, "An appellate court generally possesses by virtue of inherent power and in some states by virtue of express statutory authority, broad powers and discretion with respect to the scope of its decision and the relief to be granted, and broadly speaking, any decision may be made in a case that its proper disposition requires."

Thus, such general statements point up the inevitable conflict that must arise· between the reluctance of a court, whether it be on jurisdictional grounds or otherwise, to adjudicate rights affecting nonappealing parties and a comparable reluctance to fragmentize its judgments and decrees as to those of the same class whose basic rights are exactly the same. With the question so delineated, we look to the case authority cited.

In People's Bank of Glasgow v. Yager, supra, this court considered a case wherein judgment on a note was obtained against two signers thereof. One appealed and one didn't. After reversal of the judgment against the appealing party, the court considered the status of the nonappealing signer. Consideration was first given to the alternative possibilities shown in the quoted text, 5B C.J.S. Appeal and Error § 1920, p. 414, and no relief was extended to the nonappealing party. However, it is of interest that the court buttressed its decision by adding that, "The one defendant may have had a valid defense and the other not." Clearly, the holding is not conclusive as to the instant question for the reason the instant case involves persons of one class with identical rights.

In the Iowa case, Scheiner's Will, supra, the opinion by the court tends to sustain movant's position. However, factually the case is distinguishable for the reason none of the class, two sisters, had appealed. Additionally, an Iowa case, more in point, is In Re Larson's Estate, 256 Iowa 1392, 131 N.W.2d 503, wherein the court had before it an appeal by all but two persons of the "same class," and the two de-

rived the same benefit and declaration of rights as the appellants. Therein, it was said: "This has the effect of allowing more to the two Johnson children than allowed them by the trial court. Ordinarily one who has not appealed is not entitled to a more favorable decision here. * * * However, a generally recognized exception is applicable here where the relief granted has been asked by appellant throughout the case, the rights of such appellees are necessarily involved, and to deny such would result in injustice."

In the Louisiana case, Succession of Manthey, supra, the court found it proper to follow the general rule previously quoted.

The recognized difficulty of determining when the general rule or its established exceptions are to be followed is apparent in decisions of other states. For instance, in New York the general rule was followed in In Re Horner's Will, 237 N.Y. 489, 143 N.E. 655, 660, but not in the later case of In Re Winburn's Will, 270 N.Y. 196, 200 N.E. 784, wherein the court reviewed the basic problem, to wit: "In the prevailing opinion in the St. John Case [St. John v. Andrews Institute for Girls], 192 N.Y. 382, at page 389, 85 N.E. 143, 145, occurs the statement: 'The great stumbling block in this case seems to be the apparent, if not real, incongruity of the result arrived at; that is to say, that a distribution will be made in favor of four of a certain class of defendants, which is denied to two others of the class, whose rights are exactly the same.' In Croker v. Williamson, 208 N.Y. 480, 484, 102 N.E. 588, 589, this court stated this rule: 'It is clear both upon reason and authority that no such anomalous result could be tolerated as that of a judgment declaring a will invalid on general grounds as to part of the legatees and valid as to others. [Citing authorities.] Thus it appears that in the face of an action involving the general validity of a will and of the probate thereof, the interests of legatees are so tied together that they cannot be separated and that a judgment re-

jecting or upholding the will as to one legatee will similarly affect the others. Their interests under the will must stand or fall together, and it would seem to be pretty clear that they are, therefore, "united." ' The same thought had previously been expressed in Altman v. Hofeller, 152 N.Y. 498, 506, 46 N.E. 961, 964, wherein it is written: 'Our attention, however, has been called to no authority which sustains the doctrine that where there is error which requires a reversal, the judgment can be properly reversed and a new trial granted as to some of the defendants and affirmed as to others, unless in a case where their interests and the issues between them are so far separate that upon a new trial the issues between the plaintiff and the defendants as to which it is affirmed will not be involved or determined; so that there cannot be two different and inconsistent judgments upon the same issue in the action.' "

Again, in California, the court said in In Re Stauffer's Estate, 142 Cal.App.2d 35, 297 P.2d 1029, at l. c. 1034: "It should further be noted that the conclusion we have reached concerning the construction of the residuary clause will redound to the benefit of Jessie Snyder who did not appeal as well as Gladys Wollenberg who did, under the rule enunciated in the case of Blache v. Blache, 37 Cal.2d 531, at page 538, 233 P.2d 547, at page 551, wherein the court expressly held: 'It is true that there are cases which hold that a judgment becomes final as against a non-appealing party even though the judgment is reversed on the appeal of other parties. [Citing cases.] But this rule is not applied where portions of a judgment adverse to a nonappealing party are so interwoven with the whole that appeal from a part affects the other parts; in such a situation the appellate court can reverse the entire judgment if it is necessary to do justice.' "

Perhaps of greater interest is the Missouri case of Lich v. Lich, 158 Mo.App. 400, 138 S.W. 558, wherein the court said, l. c. 565: "While the widow did not appeal, the trustee by appeal has brought up the whole will for our construction. We must construe it irrespective of the action of the trial court. No agreement of parties as to a matter of law can conclude this or any court."

An extended review of related problems in tort cases may be found in Hardwick v. Kansas City Gas Co., 355 Mo. 100, 195 S.W. 2d 504.

■ In conclusion, we have determined, under the facts of this case, that justice calls for application of one of the exceptions to the general rule. The probate court correctly applied the law of this state in directing the executor to distribute the additional shares to the named twenty-three specific legatees in paragraph 4. The trial court erroneously directed otherwise. Seventeen of the twenty-three appealed to this court and they submitted only one issue, i. e., how should the shares be distributed to those of the one class listed in paragraph 4? We have now ruled that the probate court was correct in its ruling, and we need not complicate an already difficult problem by considering the status of that order after a contrary ruling by the circuit court at a trial de novo. It is sufficient to say that this court should not issue two different and inconsistent judgments upon the one issue in this case. Doing otherwise would order, as a practical matter, the executor to follow the law as to some of a class but to disregard it as to others of the same class. The established exceptions to the general rule call for avoidance of such anomalous orders. That exception is applicable here, as noted above, "where the judgment is non-severable." As a reading of the quoted text makes clear, the non-severability of the judgment on one issue is an exception standing on its own feet. The second exception—where the rights of the parties are intermingled—need not be discussed, as it has no bearing on the first exception on which this ruling may soundly rest.

The motion is denied.